**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

UNITED STATES OF AMERICA,
the States of CALIFORNIA, COLORADO,
CONNECTICUT, DELAWARE, FLORIDA,
GEORGIA, HAWAII, ILLINOIS,
INDIANA, IOWA, LOUISIANA,
MARYLAND, MASSACHUSETTS,
MICHIGAN, MINNESOTA, MONTANA,
NEVADA, NEW HAMPSHIRE, NEW
JERSEY, NEW MEXICO, NEW YORK,
NORTH CAROLINA, OKLAHOMA,
RHODE ISLAND, TENNESSEE, TEXAS,
VIRGINIA, WASHINGTON, and the
DISTRICT OF COLUMBIA,

        Plaintiffs,

*ex rel.* [UNDER SEAL],

        Plaintiff-Relator,

        v.

[UNDER SEAL]

        Defendants.

CA No. 2:15-cv-4842-PMD

**COMPLAINT
(Jury Trial Demanded)**

**FILED *IN CAMERA* AND UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)
(Exempt from ECF)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, and the DISTRICT OF COLUMBIA, Plaintiffs, *ex rel.* GIBRAN AMEER, PHARM. D., Plaintiff-Relator, v. RESMED, INC. and RESMED, CORP. Defendants. | CA No. _____ **COMPLAINT (Jury Trial Demanded)** |

Plaintiff-Relator Gibran Ameer, Pharm. D., files this Complaint pursuant to the federal False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq.*, and analogous state false claims acts to recover monies illegally obtained by Defendants ResMed, Inc. and ResMed Corp. (collectively "ResMed") from federal health insurance programs through an illegal kickback scheme that incentivizes home medical equipment companies to sell patients ResMed Home Medical Equipment (HME) products—specifically, continuous positive airway pressure (CPAP) products, and variable/bilevel positive airway pressure (VPAP) products—in violation of the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320-7b.

This illegal scheme provides HME companies with free patient contact services with which to sell refill CPAP and VPAP products and ties the receipt of these valuable services to the HME company achieving a certain dominant percentage of market share for ResMed products among its patients, thus inducing HME companies to place patients on ResMed products in far greater numbers than they otherwise would without consideration for patient welfare or product efficacy. This kickback scheme has resulted in the submission of claims for payment to public health insurance programs in violation of federal and state false claims laws.

Plaintiff-Relator would respectfully show the Court as follows:

## JURISDICTION AND VENUE

1.     This action arises under the FCA and the AKS. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345 & 1367 and 31 U.S.C. §§ 3730(b) & 3732(a).

2.     The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts prohibited by federal law occurred in this District.

3.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a).

4.     Dr. Ameer's claims and this Complaint are not based upon the prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from news media, as enumerated by 31 U.S.C. § 3730(e)(4)(A). To the extent there has been a public disclosure unknown to Dr. Ameer, he is the "original source" and the public disclosure is a result of Dr. Ameer voluntarily providing this information to the United States prior to filing this *qui tam* action. See 31 U.S.C. § 3730(e)(4)(B).

## PARTIES

5.     The Plaintiffs in this *qui tam* action are federal and state governments responsible for the public health insurance programs that are victims of the scheme described here. Hereinafter Plaintiffs the State of California, the State of Colorado, the State of Connecticut, the State of Delaware, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Iowa, the State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana, the State of Nevada, the State of New Hampshire, the State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Washington, and the District of Columbia shall be collectively referred to as the "States."

6.     Plaintiff-Relator Gibran Ameer, Pharm. D., is a licensed pharmacist and consultant that assists healthcare providers and healthcare technology companies optimize patient services and business strategies. During his more than 12 years working in the home healthcare technology industry, Dr. Ameer has held positions as chief operating officer for a software company that specialized in assisting durable medical equipment manufacturers and wholesalers service the home care market; chief pharmacy and corporate director for a home healthcare company operating in 14 states with over 200 locations; and president and managing member of a long-term care pharmacy serving over 3,500 patients. Dr. Ameer is a South Carolina citizen residing in Lexington County.

7.     Defendant ResMed, Inc. is a publically traded corporation (NYSE:RMD) organized under the laws of the State of Delaware with its principal place of business in San Diego, California. ResMed's primary business enterprise is the sale of durable medical equipment (DME)

used to treat sleep-disordered breathing, chronic obstructive pulmonary disease, and other chronic diseases. ResMed claims to be the leading manufacturer of sleep apnea devices with a presence in over 100 countries and "millions of patients worldwide[.]" <u>See</u> ResMed website, http://www.resmed.com/us/en/consumer/utilities/about-us.html (last visited Nov. 5, 2015).

8.     Defendant ResMed, Corp. is a wholly-owned subsidiary of ResMed, Inc. organized under the laws of the State of Minnesota with its principal place of business in San Diego, California. ResMed, Corp. is responsible for ResMed, Inc.'s United States sales enterprise.

9.     Defendants shall be collectively referred to below as "ResMed."

## RELEVANT STATUTORY AND REGULATORY AUTHORITY

### The Medicare Program

10.     When Congress passed the Social Security Act of 1965, it created the Medicare Program; a remedial federal health insurance program designed to ensure "adequate medical care is available to the aged throughout this country." <u>Hultzman v. Weinberger</u>, 495 F.2d 1276, 1281 (3d Cir. 1974); <u>see</u> <u>also</u> Title XVIII of the Social Security Act, 42 U.S.C. §§ 426, 426A.

11.     Medicare Part A authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. <u>See</u> 42 U.S.C. §§ 1395c-1395i-4. Medicare Part D (Prescription Drug Plan) provides beneficiaries with assistance in paying for out-patient prescription drugs. <u>See</u> <u>id.</u> §§ 1395w-101, <u>et seq</u>.

12.     Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, as well as other medical services not covered by Part A, such as HME, Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) equipment, and supplies. <u>See</u> <u>id.</u> §§ 1395j-1395w-6.

13.     The Medicare Program is administered through the United States Department of Health and Human Services (HHS) and, specifically, the Centers for Medicare and Medicaid Services (CMS), an agency of HHS.

14.     Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.

15.     Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services and DMEPOS in specific geographic areas. These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage, and making payments with Medicare funds. The terms under which DMEPOS is reimbursed by Medicare are set forth generally at 42 U.S.C. § 414, Subpart D.

16.     To participate in Medicare, providers must certify compliance with federal law governing the Medicare Program, which includes compliance with the AKS, before they are permitted to seek reimbursement for products and services.

### The TRICARE/CHAMPUS Program

17.     The Civilian Health and Medical Program for the Uniformed Services known as TRICARE Management Activity (TRICARE/CHAMPUS) provides federal health insurance for active duty members of the armed forces and their families at non-military healthcare facilities. 10 U.S.C. §§ 1971-1106.

18.     TRICARE/CHAMPUS reimburses providers for DMEPOS on the same terms as allowed by CMS's in the Medicare Program. 32 C.F.R. § 199.4(k).

19.    To participate in TRICARE/CHAMPUS, providers must certify compliance with federal law, which includes compliance with the AKS, before they are permitted to seek reimbursement for products and services.

### The Medicaid Program

20.    The Medicaid Program is a joint federal-state program that provides health insurance benefits to poor and disabled persons. Medicaid is administered by the states, making federal involvement in the program limited to providing matching funds and ensuring states comply with certain minimum standards for federal financial participation (FFP). 42 U.S.C. §§ 1396 et seq.

21.    To receive federal approval, the Medicaid Act mandates seven enumerated medical services. See id. §§ 1396a(a)(10), 1396d(a)(1)-(5), (17), (21). A state may also elect to provide optional medical services. See id. §§ 1396(a)(10)(A), 1396(d)(a). Once a state offers an optional service, it must comply with federal mandates.

22.    DMEPOS is an optional service, unless the recipient qualifies for home health care, in which case it is part of that mandatory service. See id. § 1396a(a)(10)(D); 42 C.F.R. §§ 440.70(a), 440.70(b)(3), 441.15(a)(3) & 440.210(a)(1).

23.    Like Medicare, Medicaid providers certify compliance with state and federal law, including that the information provided is true and correct.

### The Anti-Kickback Statute

24.    The federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320-7b makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce the referral of or "to purchase, lease, order, arrange for or recommend" any good or service reimbursable under a

federal health benefits program.. 42 U.S.C. § 1320a-7b(b)(1) (referral prohibition) & (2) (purchase, lease, etc. prohibition).

25.    "Any remuneration" means any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. Id. § 1320a-7b(b)(1).

26.    AKS violations are a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both, and exclusion from federal health care programs for at least five years. See 42 U.S.C. § 1320a-7b. In addition to the statute's criminal penalties, the HHS Secretary has power to impose administrative penalties including exclusion and sanctions of $10,000 per kickback violation. Id. § 1320a-7a.

27.    The statute's prohibition against knowing and willful conduct in disregard of the law extends to any arrangement where *one purpose* of the remuneration is to induce referrals. United States ex rel. Westmoreland v. Amgen, Inc., 812 F. Supp. 2d 39, 47 (D. Mass. 2011) (collecting cases).

28.    The HHS Secretary promulgates regulations defining safe harbor practices not subject to AKS liability where the excluded practices are unlikely to result in fraud or abuse. See 42 C.F.R. § 1001.952; see also Zimmer, Inc. v. Nu Tech Med., Inc., 54 F. Supp. 2d 850, 855 (N.D. Ind. 1999) (§ 1320a–7d(b) authorizes the HHS Secretary to issue advisory opinions on what constitutes prohibited remuneration and whether an activity could result in sanctions or exclusion from federal health care programs).

29.    The 22 AKS safe harbors, enumerated at 42 C.F.R. § 1001.952(a)-(x), set conditions that, if met, will not give rise to criminal or administrative action even if a culpable mental state is proven.

30.    The Secretary has promulgated two safe harbors potentially relevant in this action.

31.    The Personal Services Exception to AKS liability exempts personal services and management contracts from the definition of "remuneration" made "by a principal to an agent as compensation for the services of the agent" when *all* of the following elements are met:

(1)  The agency agreement is set out in writing and signed by the parties.

(2)  The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a fulltime basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R. § 1001.952(d).

32.    The HHS Secretary has also exempted certain types of discounts from the definition of "remuneration" under the AKS so long as the seller "complies with the applicable standards in paragraph (h)(2) of this section[.]" Id. § 1001.952(h). The Discount Exception applies to sellers when "[t]he seller is an individual or entity that supplies an item or service for which payment may be made, in whole or in part, under Medicare, Medicaid or other Federal health care programs to

the buyer and who permits a discount to be taken off the buyer's purchase price." Id. § 1001.952(h)(2). To avail itself of the safe harbor's protection, the seller must meet *all* of the standards within one of three categories. See id. § 1001.952(h)(2)(i)-(iii) (imposing certain disclosure and reporting obligations).

33.    Notably, "the term discount means a reduction in the amount a buyer (who buys either directly or through a wholesaler or a group purchasing organization) is charged for an item or service based on an arms-length transaction." Id. § 1001.952(h)(5). "The term discount does *not* include—

[…]

(ii) Supplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service, unless the goods and services are reimbursed by the same Federal health care program using the same methodology and the reduced charge is fully disclosed to the Federal health care program and accurately reflected where appropriate, and as appropriate, to the reimbursement methodology[.]

Id. (emphasis added).

34.    A litigant seeking to avail itself of AKS safe-harbor protection bears the burden of proving it satisfies one of the safe harbors. See U.S. ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88 (3d Cir. 2009).

35.    Compliance with the AKS is a material condition of payment under federal insurance programs such that violating the AKS gives rise to a false claim. See Westmoreland, 812 F. Supp. 2d at 54 (collecting cases).

**The False Claims Act**

36.    The False Claims Act (FCA) provides, in relevant part, that:

any person who--(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; […]

* * *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

37.    FCA liability attaches to claims for payment made to a federal payor arising from a kickback scheme because, (1) since AKS compliance is a material condition of payment, kickback tainted claims are "factually false" within the meaning of the FCA; and (2) health care providers seeking reimbursement for goods and services certify that their submissions comply with the AKS.

38.    Even if a FCA defendant is not responsible for submitting (or presenting) the claim for payment, it is still liable if it causes a third party to submit claims the defendant knows are false within the meaning of the FCA.

39.    In order to be eligible to obtain reimbursement for the sale of DMEPOS from federal health care programs, HME companies, physicians, hospitals, and pharmacies enter into Provider Agreements with CMS in which they certify upon penalty of perjury that:

I agree to abide by the Social Security Act and all applicable Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

CMS Form CMS-855S at p. 23 ¶ 4 (Jan. 2013); <u>see also id.</u> at ¶ 7 ("I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.").

40.    Participation in state Medicaid programs likewise requires a certification of compliance with federal and state anti-kickback laws as a predicate for payment.

41.    Even in the absence of an express certification, the submission of a claim to a federal payor impliedly certifies that the claim is proper for payment such that the submission of a claim tainted by a kickback renders the submitting party's implied certification of compliance false within the meaning of the FCA. <u>See</u> 42 U.S.C. § 1320a-7b(g) (codifying common law doctrine holding violations of the AKS to give rise to false claims); <u>see also</u>, <u>United States ex rel. Schmidt v. Zimmer, Inc.</u>, 386 F.3d 235, 243-45 (3d Cir. 2004).

## FACTUAL ALLEGATIONS CONCERNING
## RESMED'S FRAUDULENT CONDUCT

42.    ResMed develops, manufactures, and markets DME (and software) used to treat sleep apnea—a treatment which generates considerable revenue over the life of the patient through the regular purchase of "refill" equipment, *all of which* is reimbursed by public health insurance programs.

43.    While ResMed manufactures these products, a local HME company typically fills a prescription by fitting a patient with a ResMed or competitor product. HME companies maintain patient contacts by using renewal services that contact patients to periodically remind them to order new equipment. While these services come at a notable cost, they ensure an ongoing revenue stream for both the HME company and product manufacturer.

44.    Since at least October 2014, and possibly earlier, ResMed has deliberately shifted the cost of patient renewal services by either paying for it outright or giving it away for free. In

furtherance of this scheme ResMed recently purchased two patient resupply service companies and has pushed the cost of those services "to zero" for certain HME customers. As explained below, ResMed's scheme is designed to grow market share as it provides these valuable renewal services to customers whose sales reflect an overwhelming preference for ResMed products (believed to be 60% or greater). ResMed is using this scheme to grow market share without regard for patient preference or independent medical judgment.

### The marketplace for CPAP devices and equipment

45.    Obstructive sleep apnea (OSA) is a condition in which a person's upper airway becomes narrow as the muscles relax during sleep. This results in sleep apnea (suspended breathing) and/or hypopneas (slow/shallow breathing). OSA patients suffer from reduced oxygen in the blood and restless sleep. Millions of patients in the United States are being treated for this condition.

46.    The medical treatment for OSA is positive airway pressure (PAP). PAP is created by delivering a stream of compressed air via a hose to a nasal pillow, nose mask, full-face mask, or hybrid, thus splinting the airway (keeping it open under air pressure) to deliver unobstructed breathing and reducing and/or preventing apneas and hypopneas. PAP equipment comes in two types: continuous positive airway pressure (CPAP) and variable positive airway pressure (VPAP).

47.    ResMed is the world's largest manufacturer of CPAP and VPAP equipment, however, there are numerous competitors manufacturing CPAP and VPAP equipment for sale to OSA patients.

48.    When a physician prescribes the use of a CPAP or VPAP machine, the physician's prescription typically does not specify a particular manufacturers' product or supplies.

49.     Instead, the patient "fills" the prescription at a HME company. There, a respiratory therapist, or similar medical practitioner, uses specialized medical judgment to fit the patient with the CPAP/VPAP equipment and supplies best suited to the patient's needs. The respiratory therapist's recommendation is supposed to be free of any kickback or remuneration designed to induce a recommendation for one manufacturer's equipment over another.

50.     Once a federally insured patient receives his/her initial CPAP/VPAP equipment and supplies, the patient is eligible to receive replenishment supplies approximately every three months (per Medicare guidelines). Replenishment supplies include a new mask, tubing, chinstraps/headgear, and filters.

51.     Since most OSA patients remain on CPAP/VPAP therapy for life, HME companies responsible for fitting the patient with CPAP/VPAP equipment have a significant financial interest in maintaining their patient relationships.

52.     Specifically, to ensure patients purchase replenishment supplies per Medicare guidelines, HME companies contract with third party companies to operate call centers tasked with contacting patients, with either automated or live calls, to remind them to replenish their CPAP/VPAP supplies by placing an order with the HME company.

53.     These refill orders are then submitted for reimbursement by federal payors.

54.     Medicare reimburses as much as $472 for quarterly supplies, and as much as $1,890 annually. Accordingly, a HME company that successfully maintains patient contact that results in a CPAP/VPAP supply replenishment, will receive approximately $1,890 per patient, per year from Medicare or another federal payor.

55.    While these call centers help generate and maintain dependable revenue for HME companies, they constitute a considerable business expense that subtracts from a HME company's profitability.

56.    HME companies pay a per patient, per month, fee to call center companies for their services. While this cost can vary among call center companies, the industry average price for call services is $1 per patient, per month.

**Dr. Ameer's Personal Knowledge of ResMed's kickback scheme**

57.    Since 2014, Dr. Ameer has worked as the COO of Jaysec Technologies, LLC (Jaysec). Jaysec sells software solutions to the home healthcare industry. These services include (1) patient outreach for resupply, (2) referral documentation management and retrieval, and (3) insurance verification. With respect to Jaysec's patient outreach, this service includes resupply monitoring for CPAP/VPAP patients and patient call services, as well as "automated resupply solutions" such as interactive voice, text, and email communications with patients.

58.    During Dr. Ameer's tenure with Jaysec, the company sold its services to nearly 50 homecare companies in the United States, including at least one in South Carolina.

59.    On or about August 2014, ResMed and Jaysec began discussing the possibility of ResMed acquiring Jaysec. As Jaysec COO, Dr. Ameer was integrally involved in acquisition discussions.

60.    On September 18, 2014, Jaysec signed a letter of intent to be purchased by ResMed.

61.    On November 11 and 12, 2014, Jaysec and ResMed held a product review meeting in Chicago. Dr. Ameer participated on behalf of Jaysec along with Jaysec VP of Sales, Roxie Murray. ResMed was represented by its VP of Solutions Marketing Kristie Burnes and Senior Director for Product Management for the Americas Jeremy Malecha.

62.    During this meeting, Ms. Burnes commentated on ResMed's plan for Jaysec's resupply services by explaining "we are taking a page out of the Philips playbook." She also stated, "I am not above copying exactly what they [Philips] are doing[,]" referring to a Philips Healthcare/Philips Respironics/Medsage Technologies scheme to give away resupply services as an incentive to fill prescriptions with Philips products. That scheme entailed Philips purchasing Medsage, a call center company, in order to provide free patient resupply services for patients using Philips' products. Dr. Ameer was aware of this scheme and thus understood Ms. Burnes to be suggesting a similar strategy for ResMed.

63.    On November 21, 2014, while ResMed-Jaysec negotiations continued, Dr. Ameer participated in a telephone conference with Ms. Burnes during which she again discussed ResMed's intention to give away Jaysec resupply services to HME companies.

64.    The following Monday, Dr. Ameer reported his concerns to Jaysec CEO Dan Dillion, explaining:

> The call went well, and I was clear on our message. The only concern I had about Friday's call with ResMed is that Kristie [Burnes] feels like the patient outreach will quickly go to a free benefit which will result in it being an expense instead of a revenue source for ResMed. This is a departure from our conversation on August 12th in San Diego with the replenishment team. If you remember she said "We can't take this to zero". I agree with that statement then and now. I don't believe free is possible because it would be considered an improper financial remuneration to HME companies to induce them to recommend and provide ResMed supplies to their patients in violation of the Anti-Kickback Statute. With that consideration I don't believe that the price could ever be zero and there should be revenue associated with this product class in the millions annually. Sam will shoot you a written offer and set a call for today.

Email from G. Ameer to D. Dillion, Nov. 24, 2014 (attached as **Exhibit A**). Mr. Dillion shared Dr. Ameer's concerns with Ms. Burnes and ResMed's chief taxation officer and VP of mergers and acquisition services, Sam Sinasohn, CPA. See id.

65.    On January 9, 2015, ResMed completed its acquisition of Jaysec. Dr. Ameer continued working as a consultant for ResMed/Jaysec.

66.    That same month, Dr. Ameer again reported his concerns.

67.    After Jaysec was acquired by ResMed, Dr. Ameer discovered ResMed was already paying third-party resupply service companies to service HME company patients. During a February 5, 2015 conversation with Ms. Burnes, she informed Dr. Ameer that ResMed was paying two companies—Brightree and CareTouch—for patient outreach services.

68.    In other words, ResMed's acquisition of Jaysec allowed ResMed to provide *within* the company what it was previously paying a third party to provide—free resupply services for HME companies.

69.    Continuation of the free resupply program through Brightree and CareTouch was confirmed by internal, post-acquisition communications with company employees that sought to answer common questions raised by the Jaysec deal.

Q. I'm an existing ResMed account that uses a resupply program from Brightree or CareTouch. What does this new mean for me?

A. HMEs that have an agreement with either of these promotional partners will absolutely be honored. John Robinson and Fadi Haddad will continue to manage resupply targets with Territory Managers. HMEs that are still looking for a vendor solution will have another ResMed supported option in the future. More to follow from the resupply team as we integrate Jaysec solution to ResMed.

Q. I have a HME customer that is considering the Brightree Connect resupply program, is that ResMed promotional offer still available?

A. Yes, HME's on Brightree billing platform that meet our mask business criteria are still offered the Connect 1-year promotional program. We will not offer CareTouch or Jaysec resupply promotions to HME's on Brightree billing.

ResMed/Jaysec Employee Q&A (attached as **Exhibit B**).

70.     On March 30, 2015, Dr. Ameer attended a trade show in Las Vegas, Nevada. During that meeting he spoke with Chris Moore, ResMed's Corporate Accounts Manager – East, who confirmed that several of his HME accounts were utilizing Brightree Connect to service patient resupply and that this service was being "supplemented" by ResMed. He specifically identified Medical Services of America (MSA) as one such account.

71.     MSA is a HME company based in Lexington, South Carolina. MSA is ResMed's largest South Carolina customer with approximately 32,000 patients currently being resupplied with ResMed products. ResMed is believed to provide 60 to 70 percent of the CPAP/VPAP products sold by MSA.

72.     Subsequent to his conversation with Mr. Moore, Dr. Ameer spoke with MSA's Director of Purchasing, Wade Billings, who confirmed that ResMed was paying for MSA's Brightree patient resupply services.

73.     Prior to receiving these services for free from ResMed, MSA was paying Brightree $.87 per patient per month, at an annual cost of $10.44 per patient, pursuant to an agreement that Dr. Ameer was responsible for negotiating. MSA's subsequent arrangement with ResMed saved MSA approximately $330,000 annually. Mr. Billings also explained to Dr. Ameer that this deal has been in place since October 2014.

74.     According to ResMed officers, more than 50 HME customers are participating in the Brightree program in some capacity.

75.     After the acquisition, Dr. Ameer began looking for another business venture with the expectation of winding down his consulting for ResMed on the Jaysec integration. On April 29, 2015, Dr. Ameer interviewed for a vice president's position on the Brightree executive team. During that interview, Brightree CEO Dave Cormack expressed concern about Dr. Ameer's

ongoing ResMed/Jaysec affiliation. Mr. Cormack was concerned because Brightree and Jaysec are competitor services.

76.     Mr. Cormack explained that Brightree's relationship with ResMed was important to the company because ResMed pays Brightree more than $2 million annually in fees for HME clients utilizing its patient resupply portal and e-purchasing platform.

77.     In July 2015, Dr. Ameer learned that ResMed had purchased CareTouch. While internal company memos suggested that ResMed was paying for its customer's CareTouch services as with Brightree, its acquisition of CareTouch brought those services into the company similar to the Jaysec acquisition.

78.     After he learned about the CareTouch acquisition, Dr. Ameer spoke with Ms. Murray (hired by ResMed pursuant to the Jaysec acquisition), who explained that the purpose of the CareTouch deal was to "protect [ResMed's] market share." Ms. Murray explained that during the period of October 2014 through July 2015 (i.e., from the beginning of the Jaysec acquisition period to the then-present), ResMed succeeded in converting 27 HME companies from predominately Philips products to majority ResMed.

79.     Unlike Philip's incentive program, which only pays the cost of renewal services for patients using Philip's products, ResMed pays the cost of *all* of its customer's renewal services provided the customer's sales reflect a dominant market share by ResMed. In addition to the renewal services themselves, customers also receive quarterly reports tailored to the client that provide HME companies with valuable data such as the number of patients, market share, and the dollars saved as a result of the ResMed resupply scheme, among other data points.

80.     While Ms. Burnes explained the program as available only to ResMed's "best customers" and on "a case-by-case basis," Dr. Ameer believes based on his conversations with

ResMed officers and customers that ResMed makes the program available once market share is at or around 60%.

81.    Dr. Ameer also believes that similar but less favorable variations of this program are being offered to other customers. For example, in April 2015, Fairview Home Medical Equipment in St. Paul, Minnesota gave notice to Jaysec that it was discontinuing its subscription in favor of Medsage because of a more favorable discount offer. In response, Ms. Burns authorized Ms. Murray to offer Fairview a 60 percent discount in order to keep the account and the inducement that went with it. Dr. Ameer believes ResMed arrived at the 60 percent discount (a cost of approximately $.40 per patient, per month) based on its market share of Fairview products.

82.    On September 16 and 17, 2015, Dr. Ameer attended MSA's leadership summit in Columbia, South Carolina. During that meeting Mr. Moore informed MSA's board of directors that ResMed would extend its one-year promotional offering of Brightree services by another year. This arrangement was subsequently confirmed on September 28 via a form letter (attached as **Exhibit C**) to a "Valued Partner" extending the offer through September 2016.

**ResMed's programs of either paying for or directly providing resupply services to HME companies are illegal remuneration in violation of the AKS**

83.    ResMed has offered and paid for HME companies to receive free resupply services since at least October 2014.

84.    Initially, ResMed paid third party companies Brightree and CareTouch to furnish services to its customers. These "promotional" arrangements persist still today at a cost in excess of $2 million to ResMed.

85.    In furtherance of this scheme, ResMed purchased Jaysec and CareTouch and now offers customers free resupply services directly from these acquired services.

86.    At least one purpose of this scheme is to incentivize HME companies to fill CPAP/VPAP prescriptions with ResMed products by offering to eliminate the cost of patient relationship maintenance through resupply services.

87.    These free services have real economic value to HME companies calculable in an amount of approximately $1 per patient per month.

88.    As such, these services are remuneration within the meaning of the AKS.

89.    Moreover, the HHS Secretary has not excluded this conduct from AKS liability under any AKS safe harbor. For example, these remuneration arraignments cannot meet the Personal Services Exception because they are tied to the volume or value of business generated by HME companies for ResMed. See 42 C.F.R. § 1001.952(d)(5). Likewise, this arraignment falls outside the Discount Exception because the exception *excludes* from the definition of a permissible discount, "[s]upplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service[.]" Id. § 1001.952(h)(5)(ii).

90.    ResMed has knowingly violated the AKS because it knew that providing free renewal services was a powerful incentive for HME companies to choose ResMed products over those of a competitor. Indeed, the very purpose behind ResMed's decision to purchase Jaysec (and CareTouch) was to acquire an intra-company patient renewal service, the cost of which ResMed could "push to zero" for customers that placed patients on ResMed products.

91.    This scheme implicates the remedial purpose for which the AKS was adopted by threatening to override the independent medical judgment of respiratory therapists at HME companies through a strong financial incentive to choose ResMed products.

92.     Accordingly, ResMed's financial relationships with HME companies, in which ResMed provides free patient renewal services, violates the AKS, and falls outside of the statutory and regulatory safe harbors, in one or more of the ways described above.

93.     Kickbacks are *malem in se* and compliance with the AKS is a material condition for payment by federal health insurance programs.

94.     ResMed knew its customers (HME companies) expressly certified AKS compliance when they enrolled to participate in Medicare, TRICARE, and Medicaid and expressly and impliedly certified AKS compliance each time they sought reimbursement.

### COUNT I
### FCA VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A) & (B)[1]

95.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

96.     By virtue of the conduct described above, Defendants violated the AKS, 42 U.S.C. § 1320a-7b, by:

    a.    Entering into agreements with customers to pay for valuable patient renewal services;

    b.    Providing valuable patient renewal services to customers for free;

    c.    Incentivizing customers to recommend, refer, or otherwise prefer Defendants' products over competitor products;

    d.    Offering to pay for patient renewal services contingent on an achieved market share of Defendants' products;

    e.    Providing these valuable patient renewal service incentives based on Defendants' market share of a customer's sales; and

    f.     In other such ways as discovered during the litigation of this action.

---

[1] To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint also alleges violations of the FCA prior to its recent amendments. See e.g., 31 U.S.C. § 3729(a)(1).

97.     This conduct caused false or fraudulent claims for payment to be presented to federal health insurance programs and/or caused materially false records or statements to be made or used to obtain payment from federal health insurance programs.

98.     Defendants knew that the scheme described above violated the AKS and resulted in the submission of kickback-tainted claims to federal health insurance programs.

99.     In fact, Defendants had actual knowledge that the scheme described above violated the AKS, in part because Plaintiff-Relator made multiple attempts to alert Defendants to the illegal nature of the scheme.

100.     Kickback-tainted claims for payment are materially false and fraudulent and AKS violations are material to whether the Medicare, TRICARE, and Medicaid programs will pay for DME products.

101.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to federally insured patients in the Medicare, TRICARE, and Medicaid programs.

102.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by federal health insurance programs at great cost to federal taxpayers.

103.     Defendants' conduct is a violation of 31 U.S.C. § 3729(a)(1)(A) & (B), as amended.

## COUNT II
## CALIFORNIA FALSE CLAIMS ACT VIOLATIONS OF
### Cal. Gov't Code § 12651(a)(1) &(2)

104.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

105.    By virtue of the acts described above, Defendants have violated and continue to violate Cal. Bus. & Prof. Code § 650, Cal. Welfare & Inst. Code § 14107.2, and Cal. Health & Safety Code § 445, as amended, prohibiting payment or receipt of bribes or kickbacks.

106.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

107.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

108.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

109.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

110.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

111.    Defendant's conduct is a violation of Cal. Gov't Code § 12651(a)(l) and (2), as amended.

### COUNT III
**COLORADO MEDICAID FALSE CLAIMS ACT VIOLATIONS**
**OF Colo. Rev. Stat. Ann. § 25.5-4-305**

112.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

113.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

114.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

115.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

116.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

117.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

118.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

119.    Defendant's conduct is a violation of Colo. Rev. Stat. Ann. § 25.5-4-305(1)(a) & (b), as amended.

### COUNT IV
### CONNECTICUT FALSE CLAIMS ACT VIOLATIONS OF
### Conn. Gen. Stat. Ann. § 17b-301

120.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

121.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

122.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

123.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

124.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

125.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

126.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

127.     Defendant's conduct is a violation of Conn. Gen. Stat. Ann. § 17b-301, as amended.

**COUNT V**
**DELAWARE FALSE CLAIMS AND REPORTING ACT**
**VIOLATIONS OF Del. Code Ann. tit. 6, § 1201 (a)(1) & (2)**

128.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

129.     By virtue of the acts described above, Defendants have violated and continue to violate Del. Code Ann. tit. 31 §§ 1005, 1007 & 1008, as amended, prohibiting payment or receipt of bribes or kickbacks.

130.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

131.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

132.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

133.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

134.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

135.    Defendant's conduct is a violation of Del. Code Ann. tit. 6, § 1201 (a)(1) & (2), as amended.

## COUNT VI
## FLORIDA FALSE CLAIMS ACT VIOLATIONS OF
### Fla. Stat. Ann. § 68.082(2)

136.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

137.    By virtue of the acts described above, Defendants have violated and continue to violate Fla. Stat. §§ 456.054 & 409.920, as amended, prohibiting payment or receipt of bribes or kickbacks.

138.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

139.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

140.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

141.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

142.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

143.    Defendant's conduct is a violation of Fla. Stat. Ann. § 68.082(2)(a) & (b), as amended.

## COUNT VII
## GEORGIA TAXPAYER PROTECTION FALSE CLAIMS ACT
## VIOLATIONS OF Ga. Code Ann. § 23-3-121

144.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

145.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

146.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

147.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

148.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

149.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

150.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

151.    Defendants' conduct is a violation of Ga. Code Ann. § 23-3-121(a)(1) & (2), as amended.

## COUNT VIII
## HAWAII FALSE CLAIMS ACT
## VIOLATIONS OF Haw. Rev. Stat. Ann. § 661-21

152.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

153.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

154.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

155.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

156.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

157.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

158.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

159.    Defendants' conduct is a violation of Haw. Rev. Stat. Ann. § 661-21(a)(1) & (2), as amended.

## COUNT IX
## ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT
## VIOLATIONS OF 740 Ill. Comp. Stat. Ann. 175/3

160.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

161.     By virtue of the acts described above, Defendants have violated and continue to violate the 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks), as amended, prohibiting payment or receipt of bribes or kickbacks.

162.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

163.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

164.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

165.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

166.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

167.     Defendants' conduct is a violation of 740 Ill. Comp. Stat. Ann. 175/3(a)(1) & (2), as amended.

## COUNT X
## INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
## VIOLATIONS OF Ind. Code Ann. § 5-11-5.5-2

168.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

169.    By virtue of the acts described above, Defendants have violated and continue to violate Ind. Code Ann. § 12-15-24-2, as amended, prohibiting payment or receipt of bribes or kickbacks.

170.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

171.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

172.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

173.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

174.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

175.    Defendants' conduct is a violation of Ind. Code Ann. § 5-11-5.5-2(b)(l), (2), and (8), as amended.

## COUNT XI
## IOWA FALSE CLAIMS ACT
## VIOLATIONS OF Iowa Code Ann. § 685.2

176.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

177.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

178.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

179.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

180.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

181.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

182.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

183.    Defendants' conduct is a violation of Iowa Code Ann. § 685.2.1.a & b, as amended.

## COUNT XII
### LOUISIANA MEDICAL ASSITANCE PROGRAMS INTEGRITY LAW
### VIOLATIONS OF La. Stat. Ann. § 46:438.3

184.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

185.    By virtue of the acts described above, Defendants have violated and continue to violate La. Stat. Ann. § 46:438.2, as amended, prohibiting payment or receipt of bribes or kickbacks.

186.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

187.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

188.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

189.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

190.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

191.     Defendants' conduct is a violation of La. Stat. Ann. § 46:438.3A & B, as amended.

## COUNT XIII
## MARYLAND FALSE CLAIMS AGAINST STATE HEALTH PLANS AND STATE HEALTH PROGRAMS ACT
## VIOLATIONS OF Md. Code Ann., Health-Gen. § 2-602

192.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

193.     By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

194.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

195.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

196.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

197.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

198.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

199.    Defendants' conduct is a violation of Md. Code Ann., Health-Gen. § 2-602 (a)(1) & (2), as amended.

**COUNT XIV**
**MASSACHUSETTS FALSE CLAIMS ACT**
**VIOLATIONS OF Mass. Gen. Laws Ann. ch. 12, § 5B**

200.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

201.    By virtue of the acts described above, Defendants have violated and continue to violate Mass. Gen. Laws Ann. ch. 118E § 41, as amended, prohibiting payment or receipt of bribes or kickbacks.

202.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

203.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

204.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

205.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

206.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

207.    Defendants' conduct is a violation of Mass. Gen. Laws Ann. ch. 12, § 5B(a)(1) & (2), as amended.

## COUNT XV
## MICHIGAN MEDICAID FALSE CLAIMS ACT
## VIOLATIONS OF Mich. Comp. Laws Ann. §§ 400.603, 400.606 & 400.607

208.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

209.    By virtue of the acts described above, Defendants have violated and continue to violate Mich. Comp. Laws §752.1004, as amended, prohibiting payment or receipt of bribes or kickbacks.

210.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

211.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

212.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

213.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

214.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

215.    Defendants' conduct is a violation of Mich. Comp. Laws Ann. §§ 400.603, 400.606 & 400.607, as amended.

## COUNT XVI
## MINNESOTA FALSE CLAIMS ACT
## VIOLATIONS OF Minn. Stat. Ann. § 15C.02

216.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

217.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

218.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

219.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

220.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

221.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

222.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

223.    Defendants' conduct is a violation of Minn. Stat. Ann. § 15C.02(a)(1) & (2), as amended.

## COUNT XVII
## MONTANA FALSE CLAIMS ACT
### VIOLATIONS OF Mont. Code Ann. § 17-8-403

224.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

225.    By virtue of the acts described above, Defendants have violated and continue to violate Mont. Code Ann. § 45-6-313, as amended, prohibiting payment or receipt of bribes or kickbacks.

226.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

227.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

228.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

229.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

230.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

231.    Defendants' conduct is a violation of Mont. Code Ann. § 17-8-403(1)(a) & (b), as amended.

## COUNT XVIII
## NEVADA FALSE CLAIMS ACT
## VIOLATIONS OF Nev. Rev. Stat. Ann. § 357.040

232.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

233.    By virtue of the acts described above, Defendants have violated and continue to violate Nev. Rev. Stat. Ann. § 422.560, as amended, prohibiting payment or receipt of bribes or kickbacks.

234.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

235.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

236.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

237.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

238.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

239.    Defendants' conduct is a violation of Nev. Rev. Stat. Ann. § 357.040.1(a) & (b), as amended.

### COUNT XIX
### NEW HAMPSHIRE FALSE CLAIMS ACT
### VIOLATIONS OF N.H. Rev. Stat. Ann. § 167:61-a

240.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

241.    By virtue of the acts described above, Defendants have violated and continue to violate N.H. Rev. Stat. Ann. § 167:61-a(i), as amended, prohibiting payment or receipt of bribes or kickbacks.

242.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

243.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

244.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

245.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

246.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers. Defendants' conduct is a violation of N.H. Rev. Stat. Ann. § 167:61-a(a)-(d) & (i), as amended.

**COUNT XX**
**NEW JERSEY FALSE CLAIMS ACT**
**VIOLATIONS OF N.J. Stat. Ann. § 2A:32C-3**

247.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

248.     By virtue of the acts described above, Defendants have violated and continue to violate N.J. Stat. Ann. § 30:4D-17, as amended, prohibiting payment or receipt of bribes or kickbacks.

249.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

250.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

251.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

252.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

253.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers. Defendants' conduct is a violation of N.J. Stat. Ann. § 2A:32C-3a-b, as amended.

## COUNT XXI
## NEW MEXICO MEDICAID FALSE CLAIMS ACT
## VIOLATIONS OF N.M. Stat. Ann. § 27-14-4

254.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

255.    By virtue of the acts described above, Defendants have violated and continue to violate N.M. Stat. Ann. § 30-44-7, as amended, prohibiting payment or receipt of bribes or kickbacks.

256.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

257.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

258.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

259.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

260.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

261.    Defendants' conduct is a violation of N.M. Stat. Ann. § 27-14-4A & C, as amended.

## COUNT XXII
## NEW YORK FALSE CLAIMS ACT
## VIOLATIONS OF N.Y. State Fin. Law § 189

262.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

263.     By virtue of the acts described above, Defendants have violated and continue to violate N.Y. Soc. Serv. Law §366-d, as amended, prohibiting payment or receipt of bribes or kickbacks.

264.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

265.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

266.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

267.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

268.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

269.     Defendants' conduct is a violation of N.Y. State Fin. Law § 189.1(a) & (b), as amended.

### COUNT XXIII
### NORTH CAROLINA FALSE CLAIMS ACT
### VIOLATIONS OF N.C. Gen. Stat. Ann. § 1-607

270.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

271.     By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

272.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

273.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

274.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

275.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

276.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

**277.**     Defendants' conduct is a violation of N.C. Gen. Stat. Ann. § 1-607(a)(1) & (2), as amended.

## COUNT XXIV
## OKLAHOMA MEDICAID FALSE CLAIMS ACT
### VIOLATIONS OF Okla. Stat. Ann. tit. 63, § 5053.1

278.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

279.     By virtue of the acts described above, Defendants have violated and continue to violate Okla. Stat. Ann. tit. 56 § 1005, as amended, prohibiting payment or receipt of bribes or kickbacks.

280.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

281.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

282.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

283.     Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

284.     Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

**285.**     Defendants' conduct is a violation of Okla. Stat. Ann. tit. 63, § 5053.1.B.1 & .2, as amended.

**COUNT XXV**
**RHODE ISLAND FALSE CLAIMS ACT**
**VIOLATIONS OF 9 R.I. Gen. Laws § 9-1.1-3**

286.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

287.     By virtue of the acts described above, Defendants have violated and continue to violate 5 R.I. Gen. Laws § 5-48.1-3, as amended, prohibiting payment or receipt of bribes or kickbacks.

288.     This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

289.     Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

290.     Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

291.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

292.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

293.    Defendants' conduct is a violation of 9 R.I. Gen. Laws Ann. § 9-1.1-3(a)(1) & (2), as amended.

## COUNT XXVI
## TENNESSEE MEDICAID FALSE CLAIMS ACT
### VIOLATIONS OF Tenn. Code Ann. § 71-5-182

294.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

295.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

296.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

297.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

298.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

299.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

300.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

301.    Defendants' conduct is a violation of Tenn. Code Ann. § 71-5-182(a)(1)(A) & (B), as amended.

## COUNT XXVII
## TEXAS MEDICAID FRAUD PREVENTION ACT
## VIOLATIONS OF Tex. Hum. Res. Code Ann. § 36.002

302.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

303.    By virtue of the acts described above, Defendants have violated and continue to violate Tex. Hum. Res. Code Ann. § 32.039, as amended, prohibiting payment or receipt of bribes or kickbacks.

304.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

305.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

306.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

307.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

308.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

309.    Defendants' conduct is a violation of Tex. Hum. Res. Code Ann. § 36.002(1), (4), (12) & (13), as amended.

**COUNT XXVIII**
**VIRGINIA FRAUD AGAINST TAXPAYERS ACT**
**VIOLATIONS OF Va. Code Ann. § 8.01-216.3**

310.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

311.    By virtue of the acts described above, Defendants offered and paid kickbacks to incentivize the purchase of DME products, the cost of which Defendants knew would be reimbursed by Medicaid.

312.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

313.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

314.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

315.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

316.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

317.    Defendants' conduct is a violation of Va. Code Ann. § 8.01-216.3.A.1 & .2, as amended.

**COUNT XXIX**
**WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT**
**VIOLATIONS OF Wash. Rev. Code Ann. § 74.66.020**

318.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

319.    By virtue of the acts described above, Defendants have violated and continue to violate Wash. Rev. Code Ann. § 74.09.240, as amended, prohibiting payment or receipt of bribes or kickbacks.

320.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

321.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

322.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

323.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

324.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

325.    Defendants' conduct is a violation of Wash. Rev. Code Ann. § 74.66.020(1)(a) & (b), as amended.

## COUNT XXX
## DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT VIOLATIONS OF D.C. Code Ann. § 2-381.02

326.    Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

327.    By virtue of the acts described above, Defendants have violated and continue to violate D.C. Code Ann. § 4-802, as amended, prohibiting payment or receipt of bribes or kickbacks.

328.    This conduct caused false or fraudulent claims for payment to be presented to Medicaid and/or caused materially false records or statements to be made or used to obtain payment from Medicaid.

329.    Kickback-tainted claims for payment are materially false and fraudulent and material to whether Medicaid will pay for DME products.

330.    Defendants knew the scheme described above resulted in the submission of kickback-tainted claims to Medicaid for the reasons explained above.

331.    Defendants are liable for causing the submission of materially false and fraudulent claims for the reimbursement of DME products provided to Medicaid.

332.    Fraudulent claims arising from Defendants' conduct have been and continue to be paid by Medicaid at great cost to federal and state taxpayers.

333.    Defendants' conduct is a violation of D.C. Code Ann.§ 2-381.02(a)(1) & (2), as amended.

## PRAYER

WHEREFORE, Plaintiff-Relator on behalf of himself, the United States, and the States prays that:

i.    Defendants cease and desist from violating the AKS, the FCA, and their state analogs;

ii.    The Court enter judgment against Defendants jointly and severally:

    1.    Awarding an amount equal to three times the damages the United States has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of 31 U.S.C. § 3729;

    2.    Awarding an amount equal to three times the damages the State of California has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000,

adjusted upward as specified by applicable law, for each violation of Cal. Gov't Code § 12651;

3.     Awarding an amount equal to three times the damages the State of Colorado has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Colo. Rev. Stat. Ann. § 25.5-4-305;

4.     Awarding an amount equal to the damages the State of Connecticut has sustained because of Defendants' conduct, plus all penalties allowed by law for each violation of Conn. Gen. Stat. Ann. § 17b-301;

5.     Awarding an amount equal to three times the damages the State of Delaware has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Del. Code Ann. tit. 6, § 1201;

6.     Awarding an amount equal to three times the damages the State of Florida has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Fla. Stat. Ann. § 68.082;

7.     Awarding an amount equal to three times the damages the State of Georgia has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Ga. Code Ann. § 23-3-121;

8.     Awarding an amount equal to three times the damages the State of Hawaii has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Haw. Rev. Stat. Ann. § 661-21;

9.     Awarding an amount equal to three times the damages the State of Illinois has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of 740 Ill. Comp. Stat. Ann. 175/3;

10.    Awarding an amount equal to three times the damages the State of Indiana has sustained because of Defendants'

conduct, plus civil penalties of at least $5,000 for each violation of Ind. Code Ann. § 5-11-5.5-2;

11.    Awarding an amount equal to three times the damages the State of Iowa has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Iowa Code Ann. § 685.2;

12.    Awarding an amount equal to the damages the State of Louisiana has sustained because of Defendants' conduct, plus a civil penalty of at least $10,000 for each violation of La. Stat. Ann. § 46:438.3;

13.    Awarding an amount equal to three times the damages the State of Maryland has sustained because of Defendants' conduct, plus civil penalties of up to $10,000 for each violation of Md. Code Ann., Health-Gen. § 2-602;

14.    Awarding an amount equal to three times the damages the Commonwealth of Massachusetts has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Mass. Gen. Laws Ann. ch. 12, § 5B;

15.    Awarding an amount equal to the damages the State of Michigan has sustained because of Defendants' conduct, plus the maximum civil penalty allowable for each violation of Mich. Comp. Laws Ann. §§ 400.603, 400.606 & 400.607;

16.    Awarding an amount equal to three times the damages the State of Minnesota has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Minn. Stat. Ann. § 15C.02;

17.    Awarding an amount equal to three times the damages the State of Montana has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Mont. Code Ann. § 17-8-403;

18.    Awarding an amount equal to three times the damages the State of Nevada has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000,

adjusted upward as specified by applicable law, for each violation of Nev. Rev. Stat. Ann. § 357.040;

19.    Awarding an amount equal to three times the damages the State of New Hampshire has sustained because of Defendants' conduct, plus civil penalties of at least $5,000 to $10,000, adjusted upward as specified by applicable law, for each violation of N.H. Rev. Stat. Ann. § 167:61-a;

20.    Awarding an amount equal to three times the damages the State of New Jersey has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of N.J. Stat. Ann. § 2A:32C-3;

21.    Awarding an amount equal to the damages the State of New Mexico has sustained because of Defendants' conduct for each violation of N.M. Stat. Ann. § 27-14-4A & C;

22.    Awarding an amount equal to three times the damages the State of New York has sustained because of Defendants' conduct, plus civil penalties of at least $6,000 to $12,000, adjusted upward as specified by applicable law, for each violation of N.Y. State Fin. Law § 189;

23.    Awarding an amount equal to three times the damages the State of North Carolina has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of N.C. Gen. Stat. Ann. § 1-607;

24.    Awarding an amount equal to three times the damages the State of Oklahoma has sustained because of Defendants' conduct, plus civil penalties of at least $5,000 to $10,000, adjusted upward as specified by applicable law, for each violation of Okla. Stat. Ann. tit. 63, § 5053.1;

25.    Awarding an amount equal to three times the damages the State of Rhode Island has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of 9 R.I. Gen. Laws Ann. § 9-1.1-3;

26.    Awarding an amount equal to three times the damages the State of Tennessee has sustained because of Defendants' conduct, plus civil penalties of at least $5,000 to $25,000,

adjusted upward as specified by applicable law, for each violation of Tenn. Code Ann. § 71-5-182;

27.    Awarding an amount equal to three times the damages the State of Texas has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Tex. Hum. Res. Code Ann. § 36.002;

28.    Awarding an amount equal to three times the damages the Commonwealth of Virginia has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Va. Code Ann. § 8.01-216.3;

29.    Awarding an amount equal to three times the damages the State of Washington has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of Wash. Rev. Code Ann. § 74.66.020;

30.    Awarding an amount equal to three times the damages the District of Columbia has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of D.C. Code Ann.§ 2-381.02;

31.    Awarding Plaintiff-Relator the appropriate bounty pursuant to 31 U.S.C. § 3730 and the analogous state false claims acts; and

32.    Awarding Plaintiff-Relator attorneys' fees and costs of this action, plus interest, including the costs to the United States and the States for their expenses related to this action;

iii.    That Defendants disgorge all sums by which they have been unjustly enriched by their illegal conduct;

iv.    That the United States, the States, and Plaintiff-Relator receive all relief, both at law and at equity, to which he may reasonably be entitled; and

v.    That the Court order such further relief as it deems just and proper.

## <u>REQUEST FOR TRIAL BY JURY</u>

Plaintiff-Relator hereby demands a trial by jury.

Respectfully submitted by:


s/Richard A. Harpootlian
Richard A. Harpootlian (Fed. ID # 1730)
rah@harpootlianlaw.com
Christopher P. Kenney (Fed. ID # 11314)
cpk@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810


ATTORNEYS FOR PLAINTIFF-RELATOR
GIBRAN AMEER, PHARM. D.

December 4, 2015
Columbia, South Carolina.